UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PETER AND KATHERINE VONBANK      )
              Plaintiffs          )
                                     )
v.                                 )
                                   )    Civil Action No.:
DAVID FREDRICK, Ph.D.          )
              Defendant     )

## AFFIDAVIT OF KATHERINE VON BANK
## IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Katherine Von Bank, affirm, depose and state:

1. I am one of the Plaintiffs in the above-referenced lawsuit. I am of legal age and I make this affidavit on first hand knowledge.

2. On May 7, 2008, I attended a meeting of shareholders of Medical University of the Americas, Belize, Ltd ("MUA-B"). The meeting was in Boston.  Also in attendance was David Fredrick ("Fredrick"), his wife Patricia Hough ("Hough"), my husband and co-Plaintiff Peter Von Bank ("Peter"), and our attorney.

3. At the time of the meeting, the shareholders in MUA-B were Fredrick (50 percent), Peter and myself (35 percent), Timothy Jeffers ("Jeffers") (10 percent)  Renae and Jeffrey Sersland ("the Serslands")(4.8 percent), and a resident of Belize who owned a nominal interest.

4. The Serslands claim they own more than 4.8 percent, but that dispute is not relevant to this affidavit.

5. MUA-B is a private company.

6. I possessed the proxy of Jeffers and I communicated with him just prior to the meeting to get it. He had never been approached by Fredrick regarding a transfer of his shares at that point, and he has still never been approached by Fredrick to offer to purchase his shares.

7. Fredrick showed us a copy of his shares. The copy is attached hereto as Exhibit A. The shares are made out to David Fredrick.

8. Fredrick did not tell us at the meeting, or any time until October 31, 2008, that he had transferred his shares in MUA-B to EIC Holdings, Inc., or anyone else.

9. Fredrick never asked me if I was interested in the transfer of his shares. I am certain he never asked the Serslands, because they would have told me during settlement discussions held in October of 2008.

10. Fredrick did not tell me or Peter, until October 31, 2008, that he allegedly transferred his shares in MUA-B to EIC Holdings, Inc., during a sale of assets or stock of his medical schools.

11. Attached as Exhibit B hereto is a true and accurate copy of a Belize Supreme Court case that was obtained over the internet.

Signed under the pains and penalties of perjury this 24th day of November, 2008.

_Katherine Von Bank_

Katherine Von Bank



Number

3

4,999

Shares

MEDICAL UNIVERSITY OF THE AMERICAS - BELIZE LIMITED

THIS IS TO CERTIFY that ............ DAVID FREDRICK of Gardiner, ............ of

Massachusetts, U.S.A. ............ is the registered proprietor of ....4,999......

shares of $....1.00.......each numbered ..0003...... to .5001...... inclusive in the

capital of the Company subject to the memorandum and articles of association of the

Company and transferable only upon the production of this certificate properly endorsed,

and that the sum of $..4,999...... has been paid up in respect of each of such shares.

GIVEN under the Common Seal of the Company

this ....1ˢᵗ....day of ..August...... 2003

_____
Chairman

(Seal)

_____
Secretary



Number 1

Shares 1

## MEDICAL UNIVERSITY OF THE AMERICAS – BELIZE LIMITED

THIS IS TO CERTIFY that ____ DAVID FREDRICK of Gardner, ____ of ____

Massachusetts, U.S.A. ____ is the registered proprietor of __ 1 __

shares of $ __ 1.00 __ each numbered __ 0001 __ to __ 1 __ inclusive in the

capital of the Company subject to the memorandum and articles of association of the

Company and transferable only upon the production of this certificate properly endorsed,

and that the sum of $ __ 1.00 __ has been paid up in respect of each of such shares.

GIVEN under the Common Seal of the Company

this __ 1st __ day of __ August __ 20.03

_____
Chairman

(Seal)

_____
Secretary

## IN THE SUPREME COURT OF BELIZE, A.D. 2008

**CLAIM NO. 519 OF 2007**

|  |  |  |
|---|---|---|
| | **SAGIS INVESTMENTS LIMITED** | **Claimant** |
| **BETWEEN** | **AND** | |
| | **RADIO KREM LIMITED** | **Defendant** |

—

**BEFORE** the Honourable Abdulai Conteh, Chief Justice.


Mr. Vincent Nelson Q.C. with Dr. Elson Kaseke for the claimant.
Mr. Michael Young S.C. with Ms. Lois Young S.C. for the defendant.


—


## JUDGMENT


*Introduction*


The present proceedings before this court had their origins in 1994. They concern a claim by the claimant, Sagis Investments Ltd., to have 50,000 shares representing 10% of the defendant's company share capital registered in its name on the register of the defendant.


The defendant is a private limited liability company, whose shares are held by a small group of persons, a close-knit, almost a family-like group. In fact two of its shareholders and directors are a father and son. The flag-ship of the defendant company is its eponymously named Radio Krem,

1

whose morning talk show entitled WUB is a daily fare for radio listeners in Belize and beyond. This station, in the main, airs entertainment, educational and cultural materials. Its morning talk show however, sometimes broadcasts criticisms and commentaries on personalities, events and happenings in the country.

2.   In 1994, the defendant company was in dire need of money in order to purchase a transmitter to enable its broadcast to cover a wider spread of the country. In order to fulfill this need an investment proposal was forwarded to the claimant which would have seen a loan of $50,000.00 in promissory note at 5% on demand and another $50,000.00 for 10% shareholding, presumably in the defendant company. I say presumably because although the document evidencing this proposal was put in evidence (see **Exhibit P.O. 5** to Philip Osborne's first witness statement), however, the provenance of this faxed proposal is not clear; although it was suggested for the claimant that it came from the law firm of Musa & Balderamos on behalf of the defendant company. Mr. Charles Hyde, a director and shareholder of the defendant however, denied approaching Mr. Said Musa of that law firm to get a loan for the defendant. In the event, nothing however turns on this. Mr. Said Musa had initially made a witness statement in this case; but the claimant's learned counsel, Mr. Vincent Nelson Q.C. however, declined to call him as a witness and asked me therefore, in the circumstances, not to place any reliance on that statement. I therefore do not place any reliance on Mr. Musa's statement for the purposes of this case.

3.   The upshot of the relationship between the parties was that in May and June 1994 two transactions were executed by which the defendant was put in funds to the total of $100,000.00 (One Hundred Thousand Dollars).

4.   The first was the execution of a Promissory Note dated 17th May 1994 by the defendant through two of its directors, Mr. Evan X Hyde and Mr. Rufus X in the presence of Mr. Charles Hyde as the Secretary of the defendant, with the common seal of the defendant affixed to the Note.   By this Promissory Note, the defendant unconditionally promised to pay to the claimant (Sagis Investments Ltd.), the principal sum of Seventy-Five Thousand Dollars ($75,000.00) plus interest at the rate of 10% per annum. The manner of repayment was also stated in the Promissory Note.

5.   I should state here that in the course of these proceedings, at a very late stage, just before counsel were to address me, Mr. Nelson Q.C. sought to amend the claimant's Statement of Claim by pleading this Promissory Note and alleging fraudulent misrepresentation against the defendant. Given the nature of the issues joined between the parties on their respective statements of case, namely the claim by the claimant to be registered as a member of the defendant company and the denial of that claim by the defendant; and to avoid opening up a new vista by going into the claim for fraudulent misrepresentation, which would have undoubtedly necessitated an adjournment of the trial, the length of which could not then be determined, I declined the proposed amendment sought.

6.   However, central to the issues in this case is the second instrument executed on 17th June, 1994 by Mr. X Hyde in favour of the claimant – the Share Transfer.   By this instrument Mr. X Hyde acknowledged the payment to him by the claimant of the sum of Twenty-Five Thousand Dollars ($25,000.00) and in consideration thereof transferred to the claimant, called the transferee, shares numbered 1 to 50000 in the defendant company.  This share transfer was put in evidence by both Mr. Ian Robinson, the manager of the claimant when it was issued and by Mr. Philip Osborne who succeeded Mr. Robinson.   Both Robinson and

Osborne testified for the claimant (see **Exhibits I.R. 3** and **P.O. 8** respectively of the first witness statements of these gentlemen).

7. Because of the centrality of this share transfer to the issues in this case, I reproduce it here:

*RADIO KREM LIMITED*

*I, EVAN X HYDE, of Buttonwood Bay, Belize City in consideration of the sum of Twenty-Five Thousand Dollars ($25,000.00) paid to me by SAGIS INVESTMENTS LIMITED (hereinafter called the transferee), <u>do hereby transfer to the transferee the shares numbered 1 to 50,000 in the undertaking called RADIO KREM LIMITED to hold unto the transferee subject to the conditions laid down in Radio Krem Limited's Memorandum and Articles of Association on which I hold the same immediately before the execution hereof</u>; and we the transferee do hereby agree to accept and take the said shares subject to the conditions aforementioned.*

*IN WITNESS WHEREOF the parties have hereunto set their hands and seals the 11th day of June 1994.*

(Sgd.) *E X Hyde*      (Sgd.)  ?
_____      _____

*Transferor*      *For Transferee*

(Emphasis added – more on this later)

8. I have emphasized parts of the share transfer document as indicated above, because in my view, in the context of this case, it engages the

Memorandum and Articles of Association of the defendant company on which much may turn for the determination of this case.  It is not exactly clear who signed for the claimant company as transferee.  My queries to the claimant's counsel did not yield any conclusive response.  But it is however clear that the share transfer was executed by Mr. Evan X Hyde who as it will be shown below, at the material time held 200,000 of the defendant company's shares.

### *The shareholding and membership of the defendant company as of 17th June 1994 when the share transfer was executed*

9. Initially, the defendant company was incorporated with a share capital of $10,000.00 divided into 10,000 shares of $1.00 each.  However, by a resolution of the defendant company passed on 16th August 1991, its share capital was increased to $500,000 made up of 500,000 shares of $1.00 each.

10. As at 19th January 1992, the shareholdings in the defendant company were as follows:

| | | | |
|------|------------------|---|---------|
| (i)   | *Evan X Hyde*       | - | *200,000* |
| (ii)  | *Rodolfo Silva*     | - | *100,000* |
| (iii) | *Rufus X*           | - | *100,000* |
| (iv)  | *Charles B. Hyde*   | - | *70,000*  |
| (v)   | *Randolph Enriquez* | - | *25,000*  |
| (vi)  | *Godwin Hulse*      | - | *5,000*   |

It is important to note that these shareholdings with the designated members continued throughout the years 1993 to 1996.  (See in particular para. 3 of Mr. Michael Hyde's witness statement and para. 6 of Mr.

Charles Hyde's first witness statement.  Both Mr. Charles Hyde and Mr. Michael Hyde have been secretary to the defendant company.  Mr. Charles Hyde was in fact secretary from 1992 to 2008, when he was succeeded by Mr. Michael Hyde.

11.   What is important to note here as well is that at the material time when the share transfer was executed by Mr. Evan X Hyde in June 1994, the membership and shareholding in the defendant company was as is recorded in para. 10 above of this judgment.  On the face of the share transfer, Mr. Evan X Hyde was for a consideration of $25,000.00 transferring 50,000 of his own shareholding in the defendant company to the claimant, which represents 10% of its issued share capital.

12.   After the execution of the share transfer on 17th June 1994, there were some attempts made to have the share certificate in respect of these 50,000 shares handed over to the claimant:  see in particular paras. 31, 32, 33, 34, 36 and 37 of Mr. Philip Osborne's first witness statement and **Exhibit P.O. 12** annexed thereto.  This is a letter dated 29th June 1994 on the letterhead of Belize Bank under the hand of Mr. Osborne addressed to Mr. Charles Hyde.  In this letter Mr. Osborne wrote:

> *"I would be grateful if you could kindly arrange with the company secretary of Radio Krem Limited, for the issuance and delivery of the share certificate to us for Sagis Investments Limited in respect of the shares numbered 1 to 50,000 as set out in the transfer agreement."*

This letter also stated that a copy of the duly executed and registered transfer agreement was enclosed.

13.   Mr. Charles Hyde Sr. in his own first witness statement however stated at para. 10 that he believed a copy of the transfer instrument was delivered to him but could not recall who delivered it nor the circumstances of its delivery and that after the commencement of these proceedings he was shown the letter from the Belize Bank dated 29th June (referred to in the preceding paragraph) but he denied ever seeing that letter before.  He stated that he was certain however that the transfer of the shares in question was never tabled before the Board of Directors nor ever discussed at any meeting of the Board of Directors of the defendant company.

14.   Evidently, the last attempt, before the commencement of the present proceedings, on behalf of the claimant to obtain the share certificate in respect of the shares was in January 1995, when, according to Mr. Osborne, he telephoned Mr. Said Musa whom he referred to as Krem's lawyer, on 26th January 1995, to ask him to remind Mr. X Hyde to forward the share certificate of the 50,000 shares in Radio Krem Ltd. (the defendant) for Sagis Investments Ltd.,  that is, the claimant – see para. 34 of Mr. Osborne's first witness statement and **Exhibit P.O. 16** being telephone attendance note between Philip Osborne and Said Musa.

15.   Nothing more was heard from the claimant about the share certificate in respect of the 50,000 shares until 28th March 2007, a time span of nearly thirteen years since the execution of the share transfer document by Mr. Evan X Hyde in 1994.  On 28th March 2007, the law firm of Barrow and Williams, acting for the claimant, sent off a letter to the defendant company for the attention of Mr. Evan X Hyde, requesting *"the issue and delivery of a share certificate for the 50,000 shares transferred to (the claimant)"* - see **Exhibit P.O. 18** annexed to Mr. Osborne's first witness statement. This warning shot, as it were, across the bow of the defendants was soon followed by a letter dated 20 April 2007 from the same attorneys for the

claimant, this time to the Registrar of Companies, drawing attention to the fact that the defendant Radio Krem Ltd. had failed to file its annual summaries as required by the Companies Act (section 27) for the period 1999 – 2006 and was at the risk of being struck off the Register of Companies.  This letter asserted that the claimant, Sagis Investments Ltd., was *"a shareholder of record"* presumably of the defendant company and that it wished *"to importune"* the latter to comply with its obligation and hoped that the Registrar would obtain its compliance accordingly.  This letter was copied to the defendant – see para. 39 of Osborne's first witness statement and **Exhibit P.O. 19** annexed thereto.

16.    There then ensued a number of letters from Youngs Law Firm for the defendant and Barrow and Williams for the claimant, to the Registrar of Companies, denying the claimant's assertion of membership of the defendant company.

### *Issued joined between the parties*

17.    In November 2007, the claimant launched the present proceedings in which it claims the following relief:

> (1)    *An Order that the Defendant shall rectify its register of members by striking out the name of Evan X. Hyde as the holder of the Shares and by inserting in lieu thereof the name of the Claimant as the holder of the Shares;*

> (2)    *An Order that the Defendant give notice of the rectification to the Registrar of Companies;*

> (3)    *An Order that the Defendant issue and deliver to the Claimant a share certificate in the Claimant's name in respect of the Shares;*

    (4)    *An Order that the Defendant shall file its annual list of members and summaries with the Registrar of Companies in accordance with Section 27 of the Companies Act, Cap. 250, 2000 for the period 1999 to 2006;*

    (5)    *A Declaration that all and any rights and entitlements of shareholders of the Defendant since 17 June 1994 (including but not limited to any rights derived from the Shares in the Defendant such as dividends, share distributions and other entitlements such as share subscription rights) should be given to the Claimant as a member of the Defendant in order to ensure, inter alia; (i) its holding of ten per cent. (10%) of the issued share capital of the Defendant is maintained and has not been unlawfully diluted in anyway; and (ii) that it receives everything it is entitled to receive since 17 June 1994.*

    (7)    *Costs; and*

    (8)    *Any or such other relief which the Court thinks fit.*

18.    The claim for an order to appoint an inspector pursuance to section 110 of the Companies Act to investigate the affairs of the defendant company was later abandoned.

19.    The defendant for its part has denied that claimant is entitled to be registered as a member.  In the main, it is the contention of the defendant that by its Articles of Association, the 50,000 shares could not have been validly transferred by Mr. X Hyde to the claimant.   In particular, the defendant says that by Article 31(2) of its Articles of Association a shareholder is not permitted to transfer shares in it *"unless the right of pre-emption hereinafter conferred shall have been exhausted."*   The defendant also states that at no time did it receive a transfer notice from Mr. X Hyde as is required by Article 31(3) of its Articles of Association or at all.   The defendant further avers that the matter of the intended transfer of shares

9

from Mr. X Hyde to the claimant was never tabled before its Board of Directors, or discussed or dealt with by the Board.  Finally, the defendant denies that the claimant is entitled to any Declaration it seeks.

### The Factual Matrix of the case

20.    It is not in doubt that in 1994 the defendant's financial position was not admirable, it stood in dire need of funding if it were to continue its operations.  The claimant has, therefore, through its learned attorney Mr. Vincent Nelson Q.C., eloquently and plausibly argued with the forensic virtuosity befitting one of Her Majesty's Counsel, that the whole arrangement between the parties was a business transaction between business people.  Therefore, as business persons, Mr. Nelson argued, their arrangement should be given effect by having the claimant's name registered in the defendant company's register as the holder of the 50,000 shares, pursuant to their loan agreement.

21.    I should state here that it is a matter of some regret that the court did not have the benefit of any testimony from Mr. Said Musa of the law firm of Musa and Balderamos.  His witness statement which was filed was not relied upon by the claimant.  It would appear however from Mr. Philip Osborne's witness statement, that Mr. Musa and his law firm, Musa and Balderamos, played a crucial role in brokering the arrangement between the claimant and the defendant – see in particular paras, 18 to 23 of Osborne's first witness statement.  In fact, under cross-examination by Mr. Michael Young S.C., the learned counsel for the defendant, Mr. Osborne had to admit that Mr. Musa was, in his own words, *the main communicator* for the arrangement.  The suggestion underlying all of this is that from the claimant's point of view, the issuance of the Promissory Note for $75,000.00 and the share transfer for $25,000.00 for 50,000 shares, was

all part and parcel of an integral investment by the claimant in the defendant company in the total sum of $100,000.00

22.    I may be prepared to accept this.  But I am struck by the nature and structure of this "investment".

23.    In the first place, the $75,000.00 was secured by a Promissory Note with a schedule of payment and a given rate of interest of 10%.  It is not therefore readily apparent that this sum was in fact an investment rather than a loan.  It is however not in contention in this case.

24.    In the second place, the share transfer of 50,000 shares for $25,000.00 was from Mr. Evan X Hyde, **not** the defendant, to the claimant.  Does this fact nonetheless obviate observance of or adherence to the defendant's Articles of Association?

25.    This, in my view, is the heart of this case and it cannot be resolved without reference to the Articles of Association of the defendant company.  I shall say more on the Memorandum of Association as well, as this has been pressed on the court by Mr. Nelson Q.C. regarding the borrowing powers of the board of directors of the defendant company in the context of the factual matrix of this case.

### _Statutory provisions on the nature of shares and Private companies_

26.    Section 23(1) of the Companies Act provides:

> _23.-(1) The shares or other interests of any member in a company shall be personal estate, transferable in manner provided by the articles of the company, and shall not be of the nature of real estate._
> (Emphasis added)

11

27.   Section 122(1) provides that for the purposes of the Act the expression "private company" means a company which by its articles:

> *"(a)    restricts the right to transfer its shares"*; (emphasis added)

28.   It is common ground between the parties I think, that the defendant is a private company.   Accordingly, Article 3 of its Articles of Association expressly states:

> *"3.    The Company is a private company and accordingly:*
>
> > *(a)    the right to transfer (its) shares shall be restricted in manner hereinafter prescribed";*

## The transfer of the defendant company's shares and restrictions thereon

29.   Article 31 of the defendant's Articles of Association provides as it were a comprehensive code for the transfer of its shares by its members and places restrictions, albeit in some cases qualified on such transfers.   So far as relevant for the purposes of this case in the light of the share transfer executed by Mr. Evan X Hyde in favour of the claimant in June 1994, I shall only recite some provisions of Article 31.

> *"31.   (1)    …*
>
> > *(2)    Except as hereinafter provided no shares in the Company shall be transferred unless and until the rights of preemption hereinafter conferred shall have been exhausted*.   (Emphasis added)

12

(3)     *Every member who desires to transfer any share or shares (hereinafter called the vendor) shall give to the Company notice in writing of such desire (hereinafter called transfer notice). Subject as hereinafter mentioned, a transfer notice shall constitute the Company the vendor's agent for the sale of the share or shares specified therein (thereinafter called the said shares) in one or more lots at the discretion of the Directors, or, in case if difference, at the price which the Auditor of the Company for the time being shall, by writing under his hand, certify to be in his opinion the fair value thereof as between a willing seller and a willing buyer.  A transfer notice may contain a provision that unless all the shares comprised therein are sold by the Company pursuant to this Article, none shall be so sold and any such provision shall be binding on the Company.*

(4)     *If the Auditor is asked to certify the fair price as aforesaid, the Company shall, as soon as it receives the Auditor's certificate, furnish a certified copy thereof to the vendor and the vendor shall be entitled, by notice in writing given to the Company within ten days of the service upon him of the said certified copy, to cancel the Company's authority to sell the said shares.  The cost of obtaining the certificate shall be borne by the Company unless the vendor shall give notice of cancellation as aforesaid, in which case he shall bear the said cost.*

(5)     *Upon the price being fixed as aforesaid, and provided the vendor shall not give notice of cancellation as aforesaid, the Company shall forthwith, by notice in writing, inform each member other than the vendor of the number and price of the said shares and invite each such member to apply in writing to the Company within twenty-one days of the date of dispatch of the notice (which date shall be specified therein) for such maximum number of the said shares (being all or any thereof) as he shall specify in such application.*

(6)     *…*

(7)     *…*

(8)     *During the six months following the expiry of the said period of twenty-one days referred to in paragraph (5) of this Article, the vendor shall be at liberty to transfer to any persons and at any price (not being less than the price fixed under paragraph (3) of this*

*Article) any share not allocated by the Directors in an allocation notice PROVIDED that, if the vendor stipulated in his transfer notice that unless all the shares comprised therein were sold pursuant to this Article, none shall be so sold, the vendor shall not be entitled, save with the written consent of all the other members of the Company, to sell hereunder only some of the shares comprised in his transfer notice.*

*(9)      …*

*(10)    Notwithstanding the foregoing provisions of this Article, the Directors may refuse to register any transfer of a share where -*

*(a)      the Company has a lien on the share;*

*(b)      the Directors do not approve of the proposed transferee and the share is not a fully paid one; or*

*(c)      the registration of the share would cause the number of members to exceed the maximum permitted by Article 3.”*

30.    A read through of the Articles of Association of the defendant company would therefore readily disclose that there are restrictions and conditions on the transfer of its shares, even among its members or to persons who are not already among its membership.  These restrictions and conditions relate in the main to the right of pre-emption or right of first refusal secured for the existing members of the defendant company in the event of any transfer of its shares by a current shareholder.  The other condition or qualification on the transfer of its shares is the **price** of the shares to be transferred: if there is a difference between the proposed seller and the company, which is constituted by the transfer notice, the agent of the vendor, then the auditor of the company shall certify in wiring his own opinion as to what the fair value of the shares is as between a willing

seller and a willing buyer.  Then the other existing members of the company are given 21 days within which to apply for the shares on offer. Then six months after the 21 days the shares may be offered (transferred) to any other person, but at a price not less than that which the Auditor of the company might have determined as a fair value between a willing seller and a willing buyer.

31.    In this case, I am satisfied that there is no evidence that any attention was paid to the company's Articles of Association on the transfer of its shares in 1994, when Mr. Evan X Hyde signed, what in the light of my reading and findings on those articles, could only have been a purported transfer of shares to the claimant.  More on this later.

32.    I had produced the transfer document signed between the parties at paragraph 7 of this judgment.  Even in that document, it is clearly stated that the transfer of the 50,000 shares was **"subject to the conditions laid down in (the defendant's) Memorandum and Articles of Association."**  This clearly, in my view, makes the purported transfer and its acceptance by the claimant subject to the Memorandum and Articles of Association of the defendant company.

33.    On behalf of the claimant however, Mr. Nelson Q.C. has vigorously argued that the whole arrangement between the parties was a business transaction by which the claimant agreed to invest much needed financial resources in the defendant company.  On the evidence, it is true that in 1994, the defendant was in great need of money to finance its operation as a radio station.  The claimant was approached, it is not however clear by or through whom this was done, although there is some evidence, as I have recounted in para. 21 of this judgment, suggestive that Mr. Said Musa and his law firm of Musa and Balderamos, played some role in this at the time.  The upshot was that the claimant agreed to loan the

defendant the sum of $100,000.00.   But the loan was structured in two parts: i) $75,000.00 in cash secured by a Promissory Note issued by the defendant in favour of the claimant; and ii) $25,000.00 to Mr. Evan X Hyde for 50,000 of his shares representing 10% of the share capital of the defendant company.   He duly executed a share transfer document for 50,000 shares in favour of the claimant.  There is however, uncontroverted evidence that the sum of $100,000.00 was paid into the defendant's bank account.   This sum was inclusive of $2,750.00 representing professional fees paid to the law firm of Musa and Balderamos on behalf of the defendant by the claimant.  In the event, the defendant received the total sum of $97,250.00.

34.     It is against this background that the claimant has pressed its claim to have this court order the defendant to rectify its register of members by striking out the name of Evan X Hyde in respect of the 50,000 shares and entering the name of the claimant.  Mr. Nelson Q.C. argued valiantly that this was a business arrangement which this court should give effect to.

35.     The defendant for its part, as I have stated, has stoutly rejected this on the principal ground the transfer of the 50,000 shares would not be in accord with its Articles of Association.

_Determination_

36.     I have listened carefully to the arguments and submissions of Mr. Nelson Q.C. for the claimant as well as those of Mr. Young S.C. for the defendant and examined and weighed the evidence in this case.  I have however, ineluctably, come to the conclusion that, I am unable to accede to the claimant's claim in these proceedings.  I am led to this conclusion for the following reasons:

In the **<u>first place</u>**, I find nothing in the relationship between the parties that would confirm that the restrictive provisions on the transfer of the shares of the defendant company, as contained in clause 31 of its Articles of Association, had been displaced or were intended to be displaced. Therefore I find the purported transfer of 50,000 shares representing 10% of its share capital, was ineffective and contrary to its Articles of Association.  I must say that it is the role and function, nay duty of the courts, to give effect to the business purpose intended by the parties to a business agreement.  But this cannot be done in a void or at the expense of the law.  In this case, the claimant, which it was suggested, was formed for the purpose of consummating the arrangement with the defendant, must have known that it was dealing with a private company with registered Memorandum and Articles of Association.  A prudent and business-like person would doubtless, have inspected these public documents to see if there were any restrictions on the transfer of its shares.  Evidently, no one bothered on the part of the claimant to inspect or read these documents.

37.   The issue of restrictions on the transferability of the shares of private companies, to be found in the Articles of Association of these companies, has confronted the courts over the years and has given rise to voluminous case-law.  Professor Gower in his **Principles of Modern Company Law** 5th Ed. (1992), has helpfully set out some propositions he thought could be usefully extracted from the plethora of case-law in this area at pp. 396 - 398 and the cases cited then.  Each case, no doubt, should be determined in the light of the interpretation of the particular restrictive provisions of the Articles of Association of the particular company concerned.  In this case, I find there is no ambiguity as to the transferability of shares in the defendant company: it is clear in my mind that the right of preemption secured for existing members of the company, in clause 31(2), (3), (4) and (5) of its Articles of Association *"put a clog on the power to transfer outside the*

*ring of members of the company"* as Lord Greene M.R. put it in **Greenhalgh v Mallard and Others (1943) 2 All E.R. 234**.  See also, **Lyle and Scott Ltd. v Scott's Trustees (1959) A.C. 763**; **Hunter v Hunter (1936) A.C. 222**, and **Roberts v Letter "T" Estates Ltd. (1961) A.C. 795 P.C.** (a decision on appeal from Guyana).

38.    In the **second place**, I find that there is no evidence in this case that the other shareholders of the defendant company, apart from the two Hydes and possibly Mr. Rufus X, were in any way informed or involved in the transaction that resulted in the purported share transfer by Evan X Hyde to the claimant.  It should be remembered that at the material time in May or June 1994, there were other shareholders of the defendant company other than these three gentlemen – I have at para. 10 of this judgment stated the membership of the defendant company and shareholding in it.

I find that there was no evidence of any involvement by these other members.  But the Articles of Association of the defendant company contain a pre-emption provision which is for the benefit of these other shareholders.  If there was to be a transfer of its shares the current members must be given the right of first refusal before the shares could be transferred to non-members.  The Articles of Association, it must be remembered, is by section 14 of the Companies Act, a statutory contract between the shareholders themselves **and** between them and the company.  If the other shareholders are to forego this right of preemption or first refusal, there must, I think, be some evidence of this.  This evidence could, for example, be a resolution of the company, either of its board or general meeting, or even minutes of the company to that effect.  I find however, ominously missing in this case, any evidence of this.  The stated *"parlous financial position"* of the defendant at the time is, in my view, no reason to disregard its Articles of Association.

39.  **Thirdly**, at the material time in 1994, it was evident that **all** the shares representing the share capital of $500,000.00 of the defendant company had been allotted.  Therefore, if new shares were necessary to meet the $25,000.00 that was made available by the claimant, a resolution to this end, with allotment of the new shares to the claimant, could have been adopted by the defendant company.  It is not, in my view, any answer that all the shares had been allocated, and therefore, it was agreed that Mr. Evan X Hyde should transfer 50,000 of his own shares in satisfaction of the $25,000.00.  I therefore find that in the absence of concrete and convincing evidence, in conformity with the defendant's Articles of Association, this could not be done.

40.  **Fourthly**, undaunted by the Articles of Association of the defendant company and the submissions of its learned counsel, Mr. Young S.C., Mr. Nelson Q.C. has skillfully contended for the claimant that as the **directors** of the defendant knew about the transaction and the condition of the loan to it, that was sufficient.  This is so, Mr. Nelson Q.C. forcibly argued, by Clause 3 (21) of the defendant's Memorandum of Association, its directors had untrammeled powers to borrow on its behalf in order to carry out its objects.  This power, Mr. Nelson Q.C. submitted, trumped any restrictions there might be in the defendant's Articles of Association.  He relied on the authority of **Guiness v Land Corporation of Ireland** **(1882) 22 Ch. D 349**; **47 L.T. 517 C.A.**, for the proposition that in a conflict between the Memorandum of Association and the Articles of Association of a company, the former prevails over the latter.  This proposition, I dare say, with respect, is unexceptionable and good law.  But it is only applicable where there **is** a conflict between the two instruments.  In this case, I find **no** conflict between the defendant's Memorandum of Association and its Articles of Association.  Admittedly, the power to borrow by the defendant company, as provided in Clause 3(21) of its Memorandum of Association, is a very wide one.  It provides:

> *"To borrow, raise money or secure obligations (whether of the Company or any other person) in such manner as the Company may think fit and in particular by the issue of <u>debentures, debenture stock, (perpetual or terminable), bond, mortgages, or any other securities, founded or based upon all or any of the property and rights of the Company (both present and future) including its uncalled capital</u>, or without any such security; and to purchase, redeem or pay off any such securities."* (Emphasis added)

41.    These are indeed, wide borrowing powers that any modern company may think necessary to have.   But the breadth of these powers notwithstanding, I find, however, that they are not at odds with the Articles of Association of the defendant that are in issue here.   That is, those relating to a transfer of its shares.   In exercise of the borrowing power granted it by clause 3(21) of its Memorandum of Association, the defendant company could issue debentures, debenture stock, bonds, mortgages or any other securities founded or based on all or any of its property and rights including its uncalled capital in order to secure any loans to it.  But it could not however, I find, transfer any of the shares of its members.  The shares of members in a company are part of the personal estates of those members and transferable only in the manner prescribed by the articles of the company as provided for in section 23(1) of the Companies Act.   That is, in conformity with the company's Articles of Association.

I therefore find the two provisions in question here, that is, the power to borrow by the company as provided for in clause 3(21) of the defendant's Memorandum of Association, and the transfer of its shares as provided for in clause 31 of its Articles of Association, are **not** in opposition one to the

other.  Rather, in my view, they deal with two distinct and separate issues, viz, the power to borrow and the transfer of the defendant's shares.

42.    **Fifthly**, from the evidence, I am satisfied that both Mr. Charles Hyde Sr. and Mr. Evan X Hyde, knew of the condition of the loan.  Indeed, I find Mr. Hyde Sr. to be an honest and truthful witness, though his recollection of the events, like the two witnesses for the claimant, Mr. Robinson and Mr. Osborne, was understandably, because of the passage of time (some 13 years ago), spotty in places.  He was, however, firm and clear on the issue of the transfer of the shares.  The following exchanges ensued between him and Mr. Nelson Q.C.:

> "Q:    … Now Mr. Hyde, just one point I want to clear and clarify with you before I let you go and it is this.  When you told Evan X Hyde to sign, he signed.  That is correct isn't it?  There is no dispute about that.  When you told Rufus X he agreed, didn't he, that the condition should be accepted, maybe reluctantly but he accepted?
>
> A:    Which document are we speaking about?
>
> Q:    The share transfer contract.
>
> A:    Well Rufus was not prepared to sell his shares.
>
> …
>
> Q:    So it was decided that it would be Evan?
>
> A:    He was not in favour of selling his shares.
>
> Q:    It was decided that it would be Evan who would sell?
>
> A:    He did not decide that either.  None of them agreed to sell their shares.  None of the two agreed to sell his shares.
>
> Q:    Evan decided to sell his shares at the end.

*A:*    *No he did not.*

*Q:*    *Evan signed the share transfer form.*

*A:*    *He signed the share transfer but I thought we went further than that to the next step which was for somebody to reduce their share capital in the company, somebody who had the shares to reduce, it would either be Rufus X or Evan X and none of them were agreeable to that ..."*

43.    Consequently, even though Mr. X Hyde executed the share transfer document, no share certificate was ever issued to the claimant in respect of the 50,000 shares.  The transfer of these shares in my considered view, falls to be determined by the Articles of Association of the defendant company and is separate and apart from the borrowing powers of the defendant relating to the loan by the claimant.

44.    I am accordingly, unable to accept Mr. Nelson QC's argument that clause 3(21) of the defendant's Memorandum of Association provides protection to outside providers of capital to the company, safe in the knowledge that they can take a transfer of shares without the intervention of individual shareholders relying on the Articles of Association and pre-emption rights. The short answer, in my view, to this is:  whose shares are being transferred, the shareholders' or the company's?  Therefore I find and hold that there cannot, in the light of the circumstances of this case, and given the Articles of Association of the defendant company on the transfer of its shares, be a proper transfer of any of the shares of any of its members without the consent of that member consistent with these Articles.

It must be remembered that the shares are the personal property of the individual shareholders of the company, and not the company itself.

45.   I must state here that, of course, my conclusion on this, is without prejudice, to any contract or undertaking an individual shareholder might have entered into to transfer any of his shares.  But this does not, I hold, entitle the promisee of that contract or the would-be beneficiary of that undertaking to the right to be registered as a member of the defendant company by virtue of any purported transfer of shares to him that is not in conformity with the company's Articles of Association on the transfer of its shares.

46.   **Sixthly**, still undaunted, Mr. Nelson Q.C. valiantly further tried to press into service the **Duomatic** principle.  This principle which derives its name from the case which established it – **Re Duomatic Ltd. (1969) 1 All E.R. 161**; **(1969) 2 Ch, 365**, is that unanimous assent even if informally arrived at, may be tantamount to a resolution of a properly convened general meeting of the company and therefore valid to bind the company.  Thus in **Wright v Atlas Wright (Europe) Ltd. (1999) 2 BCLC 301 C.A.**, it was held that informal unanimous assent was effective to validate a director's contract of employment, though it had not been put before the shareholders for approval at a meeting as required by s. 319 of the English Companies Act 1985.   Indeed, the **Duomatic** principle may override requirements of the Articles of the company, as was held in the case itself from which the principle derived its name.  There it was held that where it could be shown that all shareholders with the right to attend and vote at a general meeting had assented to some matter which a general meeting of the company could carry into effect, the assent was as binding as a resolution in general meeting, at p. 373 per Buckley J.  Therefore, the payments to directors who were the only ordinary shareholders of the company at the time and had approved the accounts of the company showing the payments, these could not later be disturbed in an action by the liquidator to recover these payments.

47.    I should point out that in the practical everyday world of business, companies often have recourse (though unconsciously) to this **Duomatic** principle, to validate actions taken which may not be in conformity with the articles of the company, or the statutory scheme, for carrying out a particular transaction.

48.    It has therefore been contended for the claimant that on the **Duomatic** principle, since three of the defendant shareholders (and directors at the time), Mr. Charles Hyde Sr., Mr. Evan X Hyde and Mr. Rufus X, were involved and knew of the transaction between the claimant and the defendant, of which the transfer of shares was a part, that this coupled with the fact that the financial difficulties of the defendant at the time were publicly known, it would be inconceivable that all the shareholders of the defendant company did not know of the investment agreements reached between it and the claimant.   That is to say, the issuance of the Promissory Note for $75,000.00 and the transfer of 50,000 shares for $25,000.00.   Therefore, it was submitted, as the defendant's shareholders would have been entitled to waive the Article 31 pre-emption rights at a general or extraordinary meeting, the share transfer was accordingly valid and binding as if all the shareholders and directors had consented to it.

49.    This is admittedly, a plausible argument; but I find it, on the facts and evidence in this case, to be unavailing.   In the first place, the **Duomatic** principle cannot apply where the assent of shareholders had never been sought:   **EIC Services Ltd. v Phipps (2003) All E.R. (D) 257**.   In this case, shareholder authorization was required for the capitalization of reserves of the company and an allotment of bonus shares.   The shareholders were informed in advance of the bonus issue, but their authorization was never sought.   The court concluded in that case that no formal or informal assent had been obtained and therefore there could be no reliance on **Duomatic** and it went on to note that it was not enough for

**Duomatic** purposes, to show that assent would probably have been given if asked – there had to be an actual assent.

I therefore find on this issue in this case, that given the close-knit and almost family-like membership of the defendant company, it is not enough that its claimed impecuniousity at the time was well-known, and allegedly none of its other members was in a financial position to come to its rescue, the membership must assent or be afforded the opportunity to assent or decline, in so important an area as the transfer of a not inconsiderable percentage of its shareholding (50,000 shares representing 10% of its total shares) to an outsider.  Their assent, to put it negatively, must be ascertained through the pre-emption mechanism in the defendant's Articles concerning the transfer of its shares.  This, on the evidence, was not done in this case.  There is no evidence that any assent, for whatever reason, for the transfer of the shares, was ever sought.

50.    In the second place, to the contrary, on the evidence, no assent to the transfer of the shares was ever given or obtained.  No notice of transfer in the proper sense was ever lodged with the defendant.   No **share certificate** was ever issued to the claimant in respect of the 50,000 shares.   The evidence, as I have briefly recounted at para. 42 of this judgment, was that there was a flat refusal to transfer the shares to the claimant.

51.    I therefore, find and hold that the **Duomatic** principle cannot on the facts of this case, avail the claimant.

*Delay, lapse of time and acquiescence?*

52.    Finally, though I find myself unable to grant the relief sought by the claimant in these proceedings because of the foregoing reasons I have stated above in this judgment, I cannot find that because of the rather long time, bordering on the inordinate, that has elapsed since the transactions that have given rise to this case, that it would not have been entitled to relief.

I should state here that this court will always try to give effect to the lawful business purposes intended by parties to a business agreement.  This is the duty of the courts.  But I find and hold, on the facts of this case, that neither business purpose nor business efficacy would be served if I were to accede to the claimant's request.   There is nothing, I find, that is business-like or efficacious, for the claimant to have waited after more than the lapse of a **decade**, in fact almost 13 years from June 1994 to March 2007, to now bestir itself to seek to be registered as a member of the defendant company with a not inconsiderable percentage of its shareholding.  In all the intervening years, apart from the rather desultory and inconclusive exchange between Mr. Philip Osborne for the claimant and Mr. Said Musa of the law firm of Musa and Balderamos (see paras. 18,19, 20, 22, 23, 34 and 35 of Mr. Osborne's first witness statement and the exhibits annexed thereto), there was nothing heard from the claimant. Mr. Osborne however states in para. 35 of his witness statement that he had a meeting with Mr. Charles Hyde Sr. and Mr. Evan X Hyde in September 1994 at the defendant's offices in Partridge Street, at which the issue of the new share certificate for the claimant was discussed and drinks were had by all.  This, however, has been denied by both Mr. Hyde Sr. and his son Mr. X Hyde.   However, nothing turns on this; I only mention it in relation to the time-line being considered here.  The meeting itself was allegedly in 1994 and there was a telephone call by Mr.,

Osborne to Mr. Musa in January 1995.  After this there was this rather long interval of silence on the claimant's part: not even an inquiry of the defendant why it was not being invited to shareholder's meeting or being paid dividends, if any were held or declared by the defendant company. And more ominously, why no share certificate from the defendant company had been issued to it.

In this long interval, all was, as it were, quiet on the Western Front, until the 28 March 2007, almost some thirteen years later, when the claimant sprang into action through its lawyers, at the law firm of Barrow and Williams.  On that date, this law firm wrote on behalf of the claimant directly to the defendant seeking *the issue and delivery of a share certificate for the 50,000 shares transferred to it as soon as may be"*.  This I cannot help but note was the first direct correspondence to the defendant about the 50,000 shares.

53.   Mr. Osborne for the claimant was candid in testifying as to the lapse of time regarding the transfer of shares in this case.   Under cross-examination by Mr. Young S.C. for the defendant he admitted that the issue of the shares slipped his mind as he assumed that the matter had been dealt with.  In his witness statement he stated that it was only after the claimant had conducted some searches at the Company Registry in March 2007 that it verified that, in addition to the fact that the defendant company had not filed annual summaries for 1999 – 2006, the records also showed that the claimant had not been registered as the owner of the 50,000 shares.  Mr. Osborne finally testified on this issue that it was only in 2007 when he was moving offices, that it was discovered that the claimant had no share certificate for the 50,000 shares.

54.   By any standard, it must be agreed that the lapse of time in this case between inquiry by the claimant of the 50,000 shares and the

27

commencement of these proceedings for their registration in its name, is considerable.

However, I am constrained to agree with Mr. Nelson Q.C. that this lapse of time should not be taken to mean that the claimant acquiesced in not having its name registered in the defendant's record or have the share certificate for the 50,000 shares issued to it.  He relied on the authority of **John Archbold v William Scully** **(1861) 9 H.L.C. 360**; **11 E.R. 769**.  The defendant for its part had initially pleaded the Statute of Limitation as a bar to the claimant's claim, but later resiled from this to rely on laches.  Mr. Young S.C. submitted that in view of the long time that had elapsed it would now be inequitable to have the claimant's name registered on the defendant's register.

I am, as I have said, constrained however to agree with Mr. Nelson Q.C. for the claimant on this score for the following reasons:

In the first place, there is no evidence before me that as a result of the lapse of time since 1994, the defendant had changed its position or circumstances in reliance on the fact that the claimant was not going to press for its registration as member or the share certificate.  In the second place, the obligations the claimant is seeking to enforce, if it were successful, are continuing obligations on the defendant as provided in sections 26, 27, 33 and 94 of the Companies Act.  That is, to register its members, provide an annual summary and issue share certificates to its members.

Thirdly, as was stated by Lord Wensleydale in **Archbold v Scully** **supra** at p. 778 in relation to laches and acquiescence:

> *"So far as laches is a defence, I take it that where there is a Statute pf*
> *Limitation, the objection of simple laches does not apply until the*
> *expiration of the time allowed by statute.   But acquiescence is a*
> *different thing; it means more than laches.   If a party, who could*
> *object, lies by and knowingly permits another to incur an expense in*
> *doing an act under the belief that it would not be objected to, and so a*
> *kind of permission may be said to be given to another to alter his*
> *condition, he may be said to acquiesce; but the fact of simply neglecting*
> *to enforce a claim for the period during which the law permits him to*
> *delay, without losing his right, I conceive cannot be any equitable bar."*

55.   Therefore, I cannot find, notwithstanding the passage of considerable time in this case, that this would enable me to say that the claimant had acquiesced in not having its name on the defendant's register and not receiving the share certificate for the 50,000 shares.  But, as I have found, I am not able because of the reasons I have stated at paras. 36 to 50, to accede to the claimant's requests in this case.

### Conclusion

56.   I therefore conclude that in the light of my findings more particularly stated in paras. 36 to 50 of this judgment, I am unable to grant any of the relief the claimant seeks.  As I had intimated to Mr. Nelson Q.C. during the course of the hearing, the availability of any of the relief would be contingent on my finding on the main claim to have the claimant registered as holder of the 50,000 shares in the defendant company.  Accordingly I will enter judgment for the defendant and dismiss the claimant's claim.

57.   However, I cannot part with this judgment without saying something about the fate of the $25,000.00 which the claimant paid in the hope of getting

29

50,000 shares in the defendant company.  I have found that the transfer of these shares in the circumstances of this case was ineffective.

Mr. Evan X Hyde, who is really not a party to these proceedings, had offered to repay this sum plus reasonable interest to the claimant, probably on the basis of the ineffective share transfer he executed in favour of the claimant.   There is evidence of this offer in these proceedings:  see supplemental witness statement of Mr. X Hyde at para. 4.   But the evidence shows, as well, that the $25,000.00, like the $75,000.00, was paid not to Mr. X Hyde, but into the bank account of the defendant.  In the circumstances therefore, I am inclined to the view that this sum of $25,000.00 should be added to the $75,000.00 for which the defendant issued a promissory note and be treated as part of the same transaction.  This would make a grand total of $100,000.00 received by the defendant from the claimant (less the $2,750.00 paid to the law firm of Musa and Balderamos on the defendant's benefit).

58.     This outcome, I believe, will be more in accord with the parties' original intention – a loan of $100,000.00 from the claimant to the defendant.  This $25,000.00 was however not part of the Promissory Note with its schedule of payment and rate of interest.   But I will order that the defendant company will repay it together with a rate of interest of 6% from June 1994 to November 2007 when the claimant commenced the present proceedings.

59.     In the result, I order as follows:

        i)     An Order that the Defendant rectify its register of members by striking out the name of Evan X Hyde as the holder of 50,000 shares of the defendant and inserting the name of the claimant, Sagis Investments

Ltd. in place thereof as the holder of the said shares is refused;

ii)   The Defendant shall give no notice of rectification of its register to the Registrar of Companies;

iii)   The Defendant shall not issue and deliver a share certificate to the claimant in respect of the said shares;

iv)   The Defendant shall, pursuant to section 27, of the Companies Act, file its annual list of its members and summaries with the Registrar of Companies;

v)   The claimant is not entitled to any rights and entitlements as a shareholder of the Defendant since 17th June 1994 or at all and has never been the holder of 10% of the issued share capital of the Defendant;

vi)   The Defendant shall repay the sum of $25,000.00 plus 6% interest thereon to the claimant from 17 June 1994 to 9 November 2007 when these proceedings were commenced;

vii)    The claimant shall pay the defendant the sum of $30,000.00 as costs.




**A.  O. CONTEH**
**Chief Justice**


**DATED:**    **27th May 2008.**